UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| PHILLIP MARONGE | CIVIL ACTION |
| VERSUS | NO. 08-4959 |
| HUNT PETROLEUM COMPANY, ET AL. | SECTION "N" (2) |

## ORDER AND REASONS

Before the Court are the following three motions: (1) XTO Offshore Inc.'s Motion for Summary Judgment (Rec. Doc. 75); (2) Eagle Consulting, LLC Motion for Summary Judgment (Rec. Doc. 88); and (3) Island Operating Company, Inc. Motion for Summary judgment (Rec. Doc. 100). These motions are opposed. (See Rec. Doc. 107). After considering the memoranda of the parties and the applicable law, the Court rules as set forth herein.

**I.   BACKGROUND**

Cudd Pressure Control, Inc. ("Cudd") hired Plaintiff Phillip Maronge as a snubbing specialist on August 16, 2007. (Exhibit 2 to Rec. Doc. 75, p. 94). At the time of Plaintiff's accident which is the basis for this lawsuit, he was working for Cudd on a platform owned by Hunt Petroleum Company, Inc. ("Hunt").[1] On October 7, 1998, Hunt and Cudd entered into a

---

[1] XTO Offshore, Inc. ("XTO") is the successor in interest to Hunt. The Court will use the names "Hunt" and "XTO" interchangeably herein.

Master Work/Service Agreement ("Hunt/Cudd MSA") under which Cudd was to perform work on various Hunt-owned offshore platforms. (Exhibit 1 to Rec. Doc. 75).[2]

Plaintiff's accident allegedly occurred shortly before midnight on December 6, 2007.[3] While alone of the platform, Plaintiff made the decision (without otherwise being told to do so by anyone)[4] to retrieve wooden boards to be used for a pipe rack from the top of a building used as living quarters/laundry. (Exhibit 2 to Rec. Doc. 75, pp. 157-158, 174, 176-177, 183-184, 252-253). This building was approximately 12 feet high. (Exhibit I to Rec. Doc. 100, p. 185). It is alleged that these boards were previously placed on this building by a crane; however, it is

---

[2] Under the Hunt/Cudd MSA, Cudd was an independent contractor of Hunt. According to that agreement, Cudd was responsible for the supervision and control of its employees and for their training, safety, and health:

> It is understood and agreed between the parties hereto that the means or methods of performance of said work shall be under the exclusive control of Contractor [Cudd], Company [Hunt] being interested only in the results obtained, with the Contractor being an independent contractor. Contractor agrees that all workmen and crews provided by Contractor will have the training and physical capabilities to carry out fully in a safe manner the type of work requested by Company under the agreement. All workmen or crews provided by Contractor will at all times be under the charge and control of Contractor's supervisor.
>
> *****
>
> Relative to performance of the work hereunder, Contractor, in recognition of the scope of work, the specifics of the work location, and in Contractor's capacity as an independent contractor which is experienced in the kinds of work to be undertaken hereunder, agrees to provide all necessary training, safety equipment, and safety instructions, including a written safety plan, necessary for the safety of its employees . . .

(Exhibit 1 to Rec. Doc. 75, pp. 1, 3).

[3] Plaintiff was assigned to the night shift that worked from 6:00 p.m. to 6:00 a.m. ((Exhibit I to Rec. Doc. 100, p. 144).

[4] Plaintiff asserts that there were an insufficient number of boards left of the deck to perform the job, necessitating that someone obtain and retrieve these boards to complete this job. (Exhibit 1 to Rec. Doc. 107). Plaintiff did not speak to anyone about retrieving the boards. (Exhibit 2 to Rec. Doc. 88, p. 184). Notably, the Eagle representative on the platform had already gone to bed. (Exhibit 2 to Rec. Doc. 88, pp. 173-174).

unknown at whose direction this occurred. (See Rec. Doc. 107, p. 2)[5].

To retrieve the boards, Plaintiff climbed onto a life jacket box (using it in lieu of a ladder). From there he climbed onto a paint locker, and from there onto the top of the living quarters/laundry building. (Exhibit 2 to Rec. Doc. 75, p. 188). There was no ladder affixed to this building. (Exhibit 1 to Rec. Doc. 107). After throwing the boards from the building to the deck, Plaintiff reversed his previous actions to climb down, but alleges that he slipped off the life jacket box and struck his knee on the deck. (Exhibit 2 to Rec. Doc. 75, p. 188). In his affidavit, Plaintiff asserts that he wore a harness and fall arrest, but the accident still occurred. (Exhibit 1 to Rec. Doc. 107). No one witnessed this accident. (Exhibit 2 to Rec. Doc. 75, p. 221). Plaintiff candidly testified that he should have used a ladder to avoid this accident:

> Q. You would agree that your first impression is that you would like to have a ladder to access the top of this building.
>
> [Objection]
>
> A. Yes.
> ******
>
> Q. And you never made a request from anyone on the platform whether it [sic] be employed by Hunt, Island Operating, Loomis or anyone for the use of a ladder, did you?
>
> A. No, I did not.
> *******
>
> Q. Did you feel that the use of a ladder would have been the safest way to access the roof?
>
> A. Yes sir.

---

[5] Without citing to any evidence to support this assertion, Plaintiff claims that "it is believed that the crane was operated by Island." (Rec. Doc. 107, p. 2).

3

>     *******
>
>     Q.      And based on your training you should have stopped what you
>             were doing and gone and asked for a ladder, do you agree with
>             that?
>
>     [Objection]
>
>     A.      Yes, sir.
>     *******
>
>     Q.      You would agree with me that had you used a ladder and tied off
>             like you said this accident probably wouldn't have happened.
>
>     [Objection]
>
>     A.      Yes, sir.

(Exhibit 2 to Rec. Doc. 75, pp. 197-200, 210-211). Plaintiff asserts that while there was a storage building where all equipment was stored on the platform, no Cudd employees (including Plaintiff) were allowed to enter. (Exhibit 1 to Rec. Doc. 107). Plaintiff also asserts that it is unknown whether there were any ladders in that storage building. (Exhibit 1 to Rec. Doc. 107). Plaintiff testified that Cudd has required him to take several safety classes and made it the responsibility of its employees to following the instructions in its safety manual. (Exhibit 2 to Rec. Doc. 75, pp. 103-107, 138, 167). Plaintiff also testified that Cudd trained its employees to cease working if any work condition was unsafe. (Exhibit 2 to Rec. Doc. 75, p. 110).

It is also undisputed that no Hunt employee was on the platform at the time of Plaintiff's injury. (Exhibit 3 to Rec. Doc. 75, no. 6). Hunt, however, had hired Eagle Consulting, L.L.C. ("Eagle") to act as its company representative on the platform.[6] While an Eagle company

---

[6] Eagle and Hunt are parties to a separate master service contract ("Hunt/Eagle MSA") (Exhibit 4 to Rec. Doc. 88). Under the Hunt/Eagle MSA, Eagle was an independent contractor of Hunt. (Exhibit 4 to Rec. Doc. 88, p. 3). There is no contractual relationship between Eagle and Cudd.

representative, Jerry Cloud ("Cloud"), was present on the platform, Plaintiff testified that Cudd provided its own supervisors to monitor its employees' work. (Exhibit 2 to Rec. Doc. 75, p. 162, Exhibit 2 to Rec. Doc. 88, pp. 146-148). Sterling Bourgeois ("Bourgeois") was the Cudd employee who supervised Plaintiff's work. (Exhibit 2 to Rec. Doc. 75, pp. 143-144). According to Plaintiff, Bourgeois was the only individual who directed the manner and method in which Cudd employees did their work. (Exhibit 2 to rec. Doc. 88, p. 165). Plaintiff makes the peculiar assertion in his affidavit that Cloud was asleep at the time of his accident, "but was aware of what was being done." (Exhibit 1 to Rec. Doc. 107).

Island Operating Company, Inc. ("Island"), another defendant sued by Plaintiff, employs production operators who man several oil and gas platforms, including the one on which Plaintiff was injured.[7]

## II.   ARGUMENTS OF THE PARTIES

XTO, Eagle, and Island all make similar arguments as to why summary judgment is appropriate. XTO/Hunt asserts that it hired Cudd, an independent contractor to perform work on the platform. It notes that only Cudd had the authority to direct the manner and method of its employees' work. Hunt argues that it was in no way involved in the direction, instruction, or supervision of Cudd employees, including Plaintiff. Hunt also asserts that Plaintiff admittedly failed to use proper safety precautions (i.e., a ladder). Hunt reiterates that no one from Hunt was on the platform, Eagle did not supervise or control Plaintiff's work when the accident occurred, and all of Plaintiff's instructions came from a Cudd employee, Bourgeois.

---

[7] Island and Hunt are parties to a yet another master service contract ("Hunt/Island MSA") (Exhibit II to Rec. Doc. 100). There is no contractual relationship between Island and Cudd.

Hunt also asserts that while two exceptions exist to the general rule that a principal has no duty to protect an independent contractor's employees from injury during the course of the contract work, neither one applies: (1) the ultrazaradous activities exception does not apply here because workover drilling is not an ultrahazardous activity. See *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 550 (5th Cir. 1987); and (2) the operational control exception does not apply because, aside from the clear language of the Hunt/Cudd MSA, Plaintiff himself confirmed that Hunt had no control over the work performed by Cudd employees. (Exhibit 1 to Rec. Doc. 75; Exhibit 2 to Rec. Doc. 75, pp. 162-163, 165, 252-253).

Eagle made similar arguments in support of its motion. Eagle asserts that it owed no legal duty to Plaintiff. It did not own the platform, it did not employ Plaintiff, and it did not provide any equipment to him. Eagle notes that it was Plaintiff who made the decision to retrieve the boards, and no one from Eagle controlled or supervised his work at that hour. Eagle notes that its representative, Cloud, was off duty and asleep at the time Plaintiff was injured. (Exhibit 2 to Rec. Doc. 88, pp. 173-174). Eagle points out that Plaintiff has admitted that he should have used a ladder, and also has admitted that he knew that if he needed extra equipment, including a ladder, he could have asked Cudd to provide the equipment. (Exhibit 2 to Rec. Doc. 75, pp. 197-200, 210-211; Exhibit 2 to Rec. Doc. 88, pp. 128-129). Eagle also argues that it exercised no operational or supervisory control over Cudd employees. (Exhibit 2 to Rec. Doc. 88, pp. 162-163, 165, 173, 252-253).

Last, Island makes similar arguments to those made by Hunt and Eagle, in support of its motion for summary judgment. Island claims that it owed no duty to Plaintiff. It argues that Plaintiffs' testimony reveals that no one from Island prompted Plaintiff to ignore applicable safety protocol and retrieve the boards without the aid of a ladder. Island notes that it had no contractual

relationship with Cudd. It claims that it and Cudd were performing separate unrelated activities on the platform. Island had nothing to do with the snubbing operations[8] performed by Cudd employees like Plaintiff; its activities were limited to providing production operators to assist in actual oil and gas production activities. Island claims that the independent contractor defense exonerates it, and the exceptions to this defense do not apply, for generally the same reasons cited by Hunt.

In opposition to these three motions, Plaintiff requests additional time to conduct discovery.[9] Next, Plaintiff argues that Defendants remain liable for their own acts of negligence. Plaintiff contends that the amount of control is a question of fact as it is disputed exactly how much involvement the company men may have had in deciding where items were stored on the platform. Plaintiff cites *Dupre v. Chevron USA, Inc.*, 20 F.3d 154 (5th Cir. 1994), for the proposition that a defendant's retention of control over the layout of a rig is an express retention of control over the environment and mandates that the defendants provide a safe work environment. Thus, Plaintiff asserts that because Defendants retained control over the storage and location of equipment on the platform, they must provide a safe work environment. Plaintiff also notes that Kenneth Kaigler, an expert in petroleum operations, stated that both Hunt and Island created the negligence that caused this accident by violating their own fall protection plans when they placed the timbers on the laundry building:

---

[8] Cudd was hired to perform a workover job to pull tubing, or pipe, out of the well. In order to perform job, it was required to pull tubing, refrag the well, and put well back online. To be clear, Plaintiff explains that while, this was a snubbing-type rig, it was not a snubbing job because there was no well pressure. (Exhibit 1 to Rec. Doc. 107).

[9] The Court notes that these motions have been pending since May of 2010. No supplemental memoranda in support of or in opposition to them were ever filed. For this reason, the Court addresses them now under the assumption that, had any further evidence come to light (either in support of or in opposition to these motions), it would have been submitted to the Court at some point in the four months these motions have been pending.

### C. OPINION #3
Hunt failed to comply with their Fall Protection Work Plan, as outlined in the Safety/Environmental Manual, (Exhibit E Page 6). This failure to comply contributed to Mr. Maronge's accident and resulting injury.

#### Basis for Opinion #3
Had Hunt complied with their Fall Protection Work Plan, the hazard of accessing the material on top of the building would have been recognized and corrected by providing a ladder or stairs for safe access to the top of the building.

### D. OPINION #4
Island Operating Company, Inc. failed to comply with their Fall Protection Work Plan, as shown in Their Safety Manual (Exhibit F Page 5). This failure contributed to Mr. Maronge's accident and resulting injury.

#### Basis for Opinion #4
Had Island Operating complied with their Fall Protection Work Plan, the hazard of accessing the material, on top of the building, would have been recognized and corrected by providing a ladder or stairs for safe access to the top of the building.

(Exhibit 2 to Rec. Doc. 107, pp. 6-7). Essentially, Plaintiff claims that Defendants are responsible for choosing to store the timbers on the building and controlling the selection of the location where the timbers were stored. Plaintiff avers that this gave Defendants actual knowledge that someone would be forced to access this area in order to obtain these timbers.

Further, Plaintiff asserts that Cloud retained responsibility at all times for safety aboard the platform and was fully cognizant of the operation and that the timbers were being stored above the building. (Exhibit 1 to Rec. Doc. 107). Plaintiff asserts that "based upon information and belief" Cloud authorized the loading of the timbers on the house (Rec. Doc. 107, p. 7). Plaintiff argues that "any safety violations and supervisory intervention he may have become involved with created a duty, even if the court believes he did not have one." (*Id.*) Thus, Plaintiff claims that if Cloud conducted a safety meeting, he thereafter assumed a duty to provide

8

a safe work environment for all, such that it can be said that operational control was retained by Eagle.

Further, Plaintiff argues that the duty to maintain a safe workplace is maintained by all three defendants. Plaintiff claims that the Coast Guard and Mineral Management Services regulations do not allow a principal or contractor to delegate or contract away responsibility for a safe working environment. Plaintiff cites to Kaigler's opinion wherein he concluded:

> Mr. Maronge was injured because he had not been provided safe access to and from the top of the building on which the 2 x 4(s) were being stored. Since the 2 x 4(s) were being stored on top of the building, it would have been necessary for personnel to occasionally climb up onto and down off of the top of building.
>
> Hunt Petroleum, Island Operating and Eagle Consulting failed to provide a safe method to access the top of the building and therefore violated the United Stated Coast Guard regulation 33 CFR 142.4 and 143.101.
>
> Since the crane operator had to have placed the 2 X 4's on the top of the building then Hunt Petroleum, Island Operating and Eagle Consulting personnel knew or should have known that the material had been places [sic] on top of the building, personnel would have to climb upon top of the building to access the material and should made the necessary arrangements for a safe method to access the top of the building.

(Exhibit 2 to Rec. Doc. 107, pp. 3-4). Kaigler based this opinion on certain Coast Guard regulations. (See Exhibit 2 to rec. Doc. 107, pp. 4-5). Kaigler further opined that failing to provide ingress and egress to the laundry building was a failure to meet the requirement that Defendants provide a safe work environment. (Exhibit 2 to Rec. Doc. 107, pp. 5-6).

Plaintiff also argues that Hunt and Island are strictly liable for the platform that was under their ownership, care, custody, and control. Plaintiff claims, "[i]t is undisputed that Island loaded the timbers by crane onto the building, necessitating the timbers be retrieved from the

building." (Rec. Doc. 107, p. 11, Exhibit 1 to Rec. Doc. 107). Thus, egress was necessary for this item within the ownership of Hunt, and the care, custody and control of Island. Plaintiff asserts that neither he nor his employer had any control over the defect that existed in the platform.

In reply, Defendants first note that Maronge failed to controvert the statement of uncontested facts filed by each of them in connection with their motions; thus, under the Local Rules, those facts are now deemed admitted.[10] Defendants also note that Plaintiff has attempted to change some of the existing facts and evidence in his affidavit that he supplied with his opposition to their motions. For instance, in Plaintiff's affidavit (as well as the report of his expert), Plaintiff avers that Island placed the wood on top of the building (Exhibit 1 to Rec. Doc. 107). However, Plaintiff testified to the contrary in his deposition:

>    Q.   Do you recall seeing those boards up there when you came on hitch on January 2, 2007?
>
>    A.   Yes, sir.
>
>    Q.   They were up there?
>
>    A.   Uh-huh (affirmative response).
>
>    MR. GIARRUSSO:
>
>         Is that a yes?
>
>    A.   Yes, sir. I said yes, sir, uh-huh. . . .
>
>    Q.   If I asked you who placed those boards up there; do you know?

---

[10] The Court notes that since this argument was made by Defendants approximately four months ago, Plaintiff has never sought to supplement his opposition to correct this "oversight."

> A. No, I do not.
>
> ************************************************************
>
> Q. And if I asked you how those boards got out there, it's either by either a supply boat or the liftboats?
>
> A. Yes, sir.
>
> Q. And if I asked you which one it was you wouldn't be able to tell me?
>
> A. I wouldn't. Uh-uh (negative response).

(Exhibit A to Rec. Doc. 113, pp. 181-182). Defendants then cite *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) for the proposition that a nonmoving party may not manufacture a dispute of fact to defeat a motion for summary judgment by submitting a declaration that contradicts or impeaches, without explanation, that party's prior deposition testimony. Thus, Defendants assert that Plaintiff's affidavit is entitled to no weight. Defendants also point out that Plaintiff's affidavit is unsigned, undated, and unverified.

Defendants note that Plaintiff's only argument seems to be that a ladder should have been provided to him before he scaled a 12-foot building. Defendants further note that Plaintiffs cites no cases that an owner or contractor on a platform owes a duty to stop another contractor's employee from engaging in an act the employee knows is potentially hazardous and which could and should have been done more safely.

### III. LAW AND ANALYSIS

#### A. Summary Judgment Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The materiality of facts is determined by the substantive law's identification of which facts are critical and which facts are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is material if it "might affect the outcome of the suit under the governing law ." *Id.*

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its summary judgment burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); see also *Lavespere v. Liberty Mut. Ins. Co.*, 910 F.2d 167, 178 (5th Cir.1990). Once the moving party carries its burden pursuant to Rule 56(c), the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex*, 477 U.S. at 324, 106 S.Ct. 2553; see also *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Auguster v. Vermillion Parish School Bd.*, 249 F.3d 400, 402 (5th Cir.2001).

When considering a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, *Gillis v. Louisiana*, 294 F.3d 755, 758 (5th Cir.2002), and draws all reasonable inferences in favor of that party. *Hunt v. Rapides Healthcare System, L.L.C.*, 277 F.3d 757, 764 (2001). Factual controversies are to be resolved in favor of the nonmoving party, "but only when there is an actual controversy, that is, when both parties have submitted evidence

of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (citations omitted). The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." See *id.* (emphasis in original) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990)).

Although the Court is to consider the full record in ruling on a motion for summary judgment, Rule 56 does not obligate it to search for evidence to support a party's opposition to summary judgment. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir.2003) ("When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."). Thus, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims. *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994).

The nonmovant's burden of demonstrating a genuine issue is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence ." *Little*, 37 F.3d at 1075. Rather a factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. *Smith v. Amedisys*, 298 F.3d 434, 440 (5th Cir.2002).

**B.    Discussion**

It is undisputed that because Plaintiff's alleged injury occurred on a fixed platform located in federal waters on the Outer Continental Shelf, Louisiana law applies under the Outer Continental Shelf Lands Act ("OCSLA") as surrogate federal law. 43 U.S.C. § 1333(a)(2)(A); *Hebert v. CXY Energy, Inc.*, 72 F. Supp. 2d 681, 685 (W.D. La. 1999).

First, as addressed in note 9 supra, these motions have been pending since May of 2010.[11] No supplemental memoranda in support of or in opposition to them were ever filed. Because Plaintiff has not sought to supplement his opposition to these instant motions in the four months they have been pending, this Court addresses them now under the assumption that, had any further evidence come to light, it would (and should) have been submitted to the Court at some point well in advance of this ruling. Further, despite Defendants arguing that Plaintiff failed to controvert the statements of uncontested facts filed by each of them in connection with their respective motions in accordance with Local Rule 56.2, Plaintiff never, in the four months these motions have been pending, sought to file such a document in response. Still further, despite the fact that Defendants noted in the Reply that Plaintiff's affidavit, which was attached to his Opposition, was unsigned, undated, and unverified, Plaintiff never, in the four months these motions have been pending, sought to file/substitute it with a signed version. Thus, the Court concludes that all material facts set forth in Defendants statements should be deemed admitted (See Rec. Doc. 113, p. 2-3), for purposes of the motion, in accordance with Local Rule 56.2. The Court further concludes that Plaintiff's unsigned affidavit is entitled to no weight. However, even if these facts were not deemed admitted and if the Court considered Plaintiff's affidavit, Defendants would still be entitled to summary judgment for the reasons that follow.

On the showing made, Plaintiff has failed to set forth any genuine issues of material fact that would preclude summary judgment as to any of these defendants. As the Court determined in *Trosclair v. Shell Oil Co.*, 1997 WL 325371 (E.D. La. 1997), this is nothing more than a

---

[11] The Court notes that this case was transferred to this section from Section C on June 29, 2010, with the three referenced motions for summary judgment already pending.

workers' compensation case. Plaintiff and/or his employer, Cudd, decided how to perform a job within the ambit of a contractual undertaking with Hunt. As a general rule, the principal (here, Hunt) is not liable for the negligence of its independent contractor (here, Cudd). *Graham v. Amoco Oil Co.*, 21 F.3d 643, 645 (5th Cir.1994); *Ainsworth*, 829 F.2d at 549.

As Defendants acknowledge, there are two exceptions to the general rule limiting a principal's liability for the negligence of its independent contractor: (1) when the suit arises out of the ultrahazardous activities of its independent contractor; or (2) when the principal retains operational control over the independent contractor's acts or expressly or impliedly authorizes those acts. *Graham*, 21 F.3d at 645. However, neither of these exceptions apply in this case to allow recovery against Defendants.

First, the ultrazaradous activities exception does not apply because workover drilling is not an ultrahazardous activity. See *Ainsworth*, 829 F.2d at 550. Further, based on the evidence presently before the Court, the second exception (retention of operations control) does not apply because Plaintiff testified that Cudd provided its own supervisors to monitor its employees' work. (Exhibit 2 to Rec. Doc. 75, p. 162, Exhibit 2 to Rec. Doc. 88, pp. 146-148). Indeed, Bourgeois was the Cudd employee who supervised Plaintiff's work. (Exhibit 2 to Rec. Doc. 75, pp. 143-144). According to Plaintiff, Bourgeois was the **only** individual who directed the manner and method in which Cudd employees did their work. (Exhibit 2 to rec. Doc. 88, p. 165).

Further, while Plaintiff attempts to assert that all of the Defendants in some way either expressly or impliedly authorized the activities giving rise to Plaintiff's alleged accident[12], the

---

[12] For instance, in the opposition, Plaintiff states, "[i]t is believed that the crane was operated by Island." (Rec. Doc. 107, p. 2) Plaintiff cites to no Rule 56 "evidence" to support this belief. Despite classifying this as a "belief" in his Opposition, Plaintiff states, in his unsigned affidavit, "Island left an insufficient number of

uncontroverted fact remains that none of them participated in any decision-making process concerning how Plaintiff performed his work and/or chose to remove the boards from the roof of the laundry building. Further, no representative from any of the defendants gave any advice regarding safety violations. *Graham*, 21 F.3d at 646. Indeed, under the Hunt/Cudd MSA, Cudd was responsible not only for the supervision and control of its employees but also for their training, safety, and health:

> Contractor agrees that all workmen and crews provided by Contractor will have the training and physical capabilities to carry out fully in a safe manner the type of work requested by Company under the agreement. All workmen or crews provided by Contractor will at all times be under the charge and control of Contractor's supervisor.
>
> \*\*\*\*\*
>
> Relative to performance of the work hereunder, Contractor, in recognition of the scope of work, the specifics of the work location, and in Contractor's capacity as an independent contractor which is experienced in the kinds of work to be undertaken hereunder, agrees to provide all necessary training, safety equipment, and safety instructions, including a written safety plan, necessary for the safety of its employees . . .

---

timbers left to perform this job necessitating someone obtain and retrieve these materials to complete the job." (Exhibit 1 to Rec. Doc. 107). Further, these statements contradict his earlier deposition testimony wherein Plaintiff testified that he did not know who placed the boards on the top of the laundry building.(Exhibit A to Rec. Doc. 113, pp. 181-182). However, as Defendants argue, a nonmoving party may not manufacture a dispute of fact to defeat a motion for summary judgment by submitting a declaration that contradicts or impeaches, without explanation, that party's prior deposition testimony. *S.W.S. Erectors*, 72 F.3d at 495. Thus, on the showing made, there is no evidence that any of these defendants placed the boards on the roof of the laundry building. This discounts Kaigler's Opinion #3 and #4, which are based on either Hunt and/or Island placing the boards on the laundry building. (See Rec,. Doc. 107, p. 6).

Plaintiff also argues that Hunt, Island, and Eagle were all aware that the boards were stored by the crane operator in an out-of-reach area that could not be accessed, but none of them offered any assistance (i.e., provided a ladder) to obtain the boards. (Rec. Doc. 107, pp. 3-4). Plaintiff further asserts that Cloud, Eagle's company man, was aware that the boards were being stored above the laundry building. ((See Rec. Doc. 107, p. 6). Next, Plaintiff, through his expert Kaigler, claims that Hunt, Island, and Eagle all failed to provide safe access to the top of the building, pursuant to applicable Coast Guard regulations. (See Rec. Doc. 107, p. 7). Last, Plaintiff contends that Hunt and Island (as the owner and operator, respectively) were strictly responsible for the platform that was under their ownership, care, custody, and control, pursuant to Louisiana Civil Code articles 2317 and 2322.

(Exhibit 1 to Rec. Doc. 75, pp. 1, 3). And even if a representative of Defendants had observed Plaintiff scaling the 12-foot high building (which Defendants deny), this does not mean that Defendants "impliedly authorized" such a procedure because Plaintiff was performing a duty for which Cudd was solely responsible under its contract with Hunt. *Id.* at 646-47.

Finally, as Plaintiff notes, while the general rule shields a principal from the acts of its independent contractor that do not fall within the above exceptions, the principal remains liable for its own acts of negligence. *Id.* However and perhaps most importantly, a platform owner and principal owe no independent duty to exercise reasonable care to protect a contractor's employee from hazards created by the contractor. *Dupre v. Chevron U.S.A., Inc.*, 109 F.3d 230, 231 (5th Cir.1997); *Graham*, 21 F.3d at 648; *Ainsworth*, 829 F.2d at 550-51.

Here, Plaintiff himself selected and implemented the procedure for the removal of the boards from the laundry building. Plaintiff has admitted that he should have used a ladder to avoid this accident and that he never made a request from anyone on the platform (including anyone associated with Hunt or Island) for the use of a ladder. In fact, Plaintiff testified:

> Q. And based on your training you should have stopped what you were doing and gone and asked for a ladder, do you agree with that?
>
> [Objection]
>
> A. Yes, sir.

(Exhibit 2 to Rec. Doc. 75, pp. 197-200, 210-211). Plaintiff admitted that he knew that if he needed extra equipment, including a ladder, he could have asked Cudd to provide the equipment. (Exhibit 2 to Rec. Doc. 88, pp. 128-129). Plaintiff also testified that Cudd trained its employees to cease working if any work condition was unsafe. (Exhibit 2 to Rec. Doc. 75, p. 110). The

Court concludes that Defendants cannot be legally responsible for such a procedure used to complete a task which was unquestionably delegated to Cudd, and they had no duty to intervene. Compare *Ainsworth*, 829 F.2d at 551 (no duty despite company man's knowledge that contractor was working without lights).

There is also no evidence that any representative from Defendants affirmatively assumed any duty to provide Cudd's employees with a safe workplace. Even if Defendants knew or observed that Plaintiff was scaling the laundry building to remove the boards from its roof (which Defendants deny), there is no evidence that Defendants voluntarily pointed out any unsafe act or reprimanded Plaintiff for any unsafe act. Thus, as in *Trosclair*, the Court finds here that Defendants cannot be said to have vicariously assumed the duty of providing Plaintiff with a safe workplace. *Graham*, 21 F.3d at 648.

### IV.     CONCLUSION

Considering the foregoing, **IT IS ORDERED** that **XTO Offshore Inc.'s Motion for Summary Judgment (Rec. Doc. 75) is GRANTED**.

**IT IS FURTHER ORDERED** that **Eagle Consulting, LLC Motion for Summary Judgment (Rec. Doc. 88) is GRANTED**.

**IT IS FINALLY ORDERED** that **Island Operating Company, Inc. Motion for Summary judgment (Rec. Doc. 100) is GRANTED**.

New Orleans, Louisiana, this 28th day of September, 2010.

                                              **KURT D. ENGELHARDT**
                                              **UNITED STATES DISTRICT JUDGE**